# IN THE UNITED STATES DISTRICT COURT

# FOR THE DISTRICT OF NEW MEXICO

GEORGETTE BARBER,

        Plaintiff,

vs.                                                          No. CIV-04-0486 JB/WDS

LOVELACE SANDIA HEALTH
SYSTEMS,

        Defendant,

consolidated with

MARY LARRAZOLO,

        Plaintiff,

vs.                                                          No. CIV-04-0447 JB/WDS

LOVELACE SANDIA HEALTH
SYSTEMS,

        Defendant.

## MEMORANDUM OPINION AND ORDER

**THIS MATTER** comes before the Court on the Defendant Lovelace Sandia Health Systems'

Motion for Summary Judgment, filed April 6, 2005 (Doc. 43). The Court held a hearing on this

Motion on September 19, 2005. The primary issues are whether: (i) Plaintiff Georgette Barber's and

Plaintiff Mary Larrazolo's claims are barred because of failure to exhaust administrative remedies;

(ii) Lovelace's no-Spanish policy constitutes a per se violation of Title VII; (iii) Lovelace offered a

legitimate, non-discriminatory reason for the no-Spanish policy; (vi) any of the actions of which the

Plaintiffs complain rise to the level of an actionable adverse employment action; and (v) Barber has

shown constructive discharge.  Because the Court finds that the Plaintiffs have failed to exhaust several of their claims; that Lovelace had a legitimate non-discriminatory reason for the no-Spanish policy; that the Plaintiffs have not presented evidence of pretext; that the  Plaintiffs' remaining claims do not rise to the level of adverse employment action; and that Barber has not shown a claim for constructive discharge, the Court will grant Lovelace's Motion for Summary Judgment.

## FACTUAL BACKGROUND

### 1.     Barber and Larrazolo.

Larrazolo and Barber were born in New Mexico.  See Deposition of Mary Larrazolo ("Larrazolo Depo.") at 36:18-22 (taken January 25, 2005); Deposition of Georgette Barber ("Barber Depo.") at 10:2-4 (taken February 23, 2005).  Larrazolo and Barber are Hispanic, and are bilingual, speaking both Spanish and English fluently.  See Larrazolo Depo. at 36:16-37:11; Barber Depo. at 10:16-11:16.  Barber grew up speaking English and learned Spanish at home and in high school; she has been fluent in Spanish for approximately ten years.  See Barber Depo. at 10:12-11:7.  Larrazolo spoke both Spanish and English growing up, and is fluent in both.  See Larrazolo Depo. at 36:23-37:10.

### 2.     Lovelace's Anti-Discrimination Policy.

Lovelace has a policy, contained in its Employee Handbook, prohibiting discrimination on the basis of national origin and providing that Lovelace has a firm commitment to providing employment, training, compensation, benefits, promotions, and other conditions or opportunities of employment without regard to any protected status, including national origin.  See Employee Handbook at 1.

Barber received a copy of the Employee Handbook when Lovelace hired her on April 28, 1997, and then again on May 15, 2002.  See Barber Depo. at 64:25-66:23.  Similarly, Larrazolo

received a copy of the Handbook when Lovelace hired her.  See Larrazolo Depo. at 158:9-159:16.

### 3.   The Tramway Clinic and Larrazolo's Employment Before the March 19 Meeting.

Lovelace is a New Mexico healthcare provider.  See Declaration of Sandra Eichenberg ("Eichenberg Decl.") ¶ 3, at 1 (executed April 6, 2005).  The Tramway Clinic, at which Barber and Larrazolo worked at the time of the events in this lawsuit, is a primary care site in Albuquerque.  See id. ¶ 4, at 1.  Brenda Coffey was the Lead Registered Nurse for the Tramway Clinic from May 27, 2001 to May 31, 2003.  See id. ¶ 5, at 2.  Coffey's last date of employment was May 31, 2003, at which time Dani Danzer became the Lead Registered Nurse.  See id.  Margaret "Peggy" Gillean was the Clinic Manager at Tramway Clinic during a portion of the Plaintiffs' employment.  See id. ¶ 6, at 2; Barber Depo. at 30:15-20.

Lovelace first hired Larrazolo to work as a Nurse Technician in the Operating Room on December 17, 1990.  See Larrazolo Depo. at 58:4-14.  She worked in various departments before she transferred to the Tramway Clinic on September 17, 2001, to work as a Medical Assistant ("MA").  See id. at 39:3-7; 58:15-18; 64:2-13.  Larrazolo requested the transfer to the Tramway Clinic so that she could work with Nurse Practitioner Marianne Wheeler who was then working at the Clinic and with whom Larrazolo had previously worked.  See id. at 63:1; 39:9-12.  MAs, like Larrazolo, are assigned to work with providers, e.g., physicians and nurse practitioners, and because Wheeler worked a reduced schedule, Larrazolo -- upon transferring to Tramway Clinic -- was also assigned to work with Dr. Peter Wong.  See id. at 67:9-68:9.

Thereafter, Coffey asked that Larrazolo work with Dr. Meuli Goff instead of Dr. Wong, because Wheeler and Dr. Goff had the same schedules and worked in the same part of the clinic.  See

id. at 68:24-70:9.  Thereafter, Dr. Goff's employment was terminated.  See id. at 70:16-18.  At the same time, Jennifer Purcell, the MA who had been working with Nurse Practitioner Barbara Wright, asked to be assigned to a different provider, as she expressed difficulty working for Wright.  See id. at 71:10-16.  After Purcell was re-assigned, Larrazolo was placed with Wright.  See id. at 71:10-16.  Larrazolo did not have any objection to this arrangement at the time.  See id. at 71:19-25.  Other employees -- Michelle Haskins, Tracy Snow, and Jennifer Purcell -- had threatened to quit if assigned to work with Wright.  See id. at 26:25-27:20.

While working with Wright, Larrazolo also continued to work with Wheeler two days per week until August 2002, when she was asked to work with Dr. Wong on a temporary basis.  See id. at 72:9-25; 172:14-21.  In January of 2003, Larrazolo was assigned to work with Wright on a full-time basis.  See id. at 172:22-173:4.

On January 9, 2003, Wheeler met with one of her patients who was 28 weeks pregnant.  See Declaration of Dani Danzer ("Danzer Decl.") ¶ 3, at 1 (executed April 6, 2005).  Because the patient had not been gaining weight, Wheeler ordered a diabetic screen.  See id.  At 6:30 p.m. that evening, Wheeler asked Jennifer Hall to look up the results of the screen in the computer.  See id.  As Hall was looking up the blood sugar level, she noticed that a drug screen had also been ordered for the patient, and the results indicated that the patient had tested positive.  See id. ¶ 3, at 1-2

Wheeler told Hall that she had not ordered any drug screens for the patient.  See id. ¶ 3, at 2.  The computer showed that a total of three drug screens had been ordered on December 16, 20, and 31, 2002.  See id.  Wheeler called Coffey to inform her of what she had discovered, and Coffey reported the incident to Gillean.  See id.

Larrazolo admitted that she had ordered the drug screens without first conferring with

Wheeler.  See id.; Larrazolo Depo. at 81:14-83:12.  MAs are not authorized to order tests on a patient without first conferring with a provider.  See Barber Depo. at 161:9-20.  As a result, on January 14, 2003, Larrazolo received a Step 1 written reprimand for ordering laboratory tests without provider approval and for failing to follow up with a patient on a positive drug screen.  See Larrazolo Depo. at 80:25-81:17.

On January 30, 2003, Larrazolo received her annual performance appraisal.  See Larrazolo Depo. at 135:19-136:8.  Out of 22 rated categories, Larrazolo received 3 "Exceptional Performer" ratings, 12 "Solid Performer" ratings, and 7 "Needs Improvement" ratings.  Id.; Pace Job Description/Performance Appraisal at 1-13 (dated January 30, 2003).

Larrazolo had issues with Gillean's January 2003 evaluation of her.  See Larrazolo Depo. at 136:22:137-14.  Larrazolo contends that she did not get a good evaluation and that the evaluation was done differently than it had been previously done.  See id.  Larrazolo maintains that she was afraid, however, to enter written comments on a corrective action form that Gillean gave her that month because she was afraid of Gillean's reaction.  See id. at 190:12-191:16.

### 4.   Barber's Employment Before the March 19 Meeting.

Barber began her employment with Lovelace working as a MA for the Tramway Clinic on April 28, 1997.  See Barber Depo. at 13:15-14:1; 16:6-9.  She worked with Dr. Keith Steichen during the entire term of her employment at the Tramway Clinic and had a good relationship with him.  See id. at 33:19-34:21.

On December 19, 2002, Barber received a Step 1 written reprimand for failing to clock out for her required lunch break.  See Barber Depo. at 150:4-151:2; Corrective Action Procedure Form at 1 (dated December 19, 2002).  Lovelace's break-and-meal-periods policy provides that all non-

exempt employees, such as Barber, must clock out for their meal breaks.  See Employee Handbook at 8.  While Barber received such a write-up, she worked through lunch at the direction of the lead nurse, Danzer.  See Barber Depo. at 175:13-18.  Specifically, she was told that she had to work through lunch if there was no one to cover her shift.  See id.

On April 18, 2003, Barber received a second corrective action, this time for failing to adhere to the Hospital's attendance policy.  See Corrective Action Procedure Form at 1 (dated April 18, 2003).  Specifically, Barber had reported to work late, left work early, or was absent on more than ten occasions in the previous one-year period.  See id.  Lovelace's attendance policy provides that employees who are absent or frequently late in arriving at work, or are early in leaving, during a twelve-month rolling period, put a burden on others to carry out their area's workload and, thus, will be disciplined.  See Employee Handbook at 5.

### 5.    The March 19 Meeting.

In early March 2003, Licensed Practicing Nurse Jamie Rivet told Barber that she had complained to Gillean about employees speaking Spanish to each other and that it made her feel uncomfortable.  See Barber Depo. at 92:2-19.  While Larrazolo and Barber concede that Rivet complained about employees speaking Spanish in the workplace, they contend that at no time did she state to them that it was disruptive, that it made patients uncomfortable, or that Larrazolo and Barber were laughing at her or others.  See Response ¶ 21, at 3.  Larrazolo and Barber maintain that Barber's testimony reflects that Rivet's statement to Barber was only that she was "tired of everybody speaking Spanish back here, and [she] went and complained about it."  Id.; Barber Depo. at 93:1-9.  While Barber assured Rivet that nothing had been said about her, Rivet refused to discuss the matter with her.  See Barber Depo. at 93:10-24.

Danzer had also received several complaints about employees speaking in Spanish to each other and laughing at the co-workers or patients.  See Danzer Decl. ¶ 4, at 2.  She received one such complaint from a Spanish-speaking patient who had overheard a conversation where the employees were speaking in a derogatory manner about others.  See id.[1]  Danzer reported these concerns to Gillean.  See id.  While Larrazolo and Barber concede that Danzer reported receiving complaints about employees speaking Spanish, they contend that at no point were Larrazolo and Barber told who the complaining employees were, nor were they ever told that the reason for the no-Spanish-speaking policy had anything to do with any allegations of derogatory comments about others.  See Response ¶ 22, at 3.[2]  A Spanish-speaking co-worker, Cheryl Lopez, has stated that she never heard Larrazolo, Barber, or any other co-workers make derogatory comments about co-workers in Spanish.  See Affidavit of Cheryl Lopez ("Lopez Aff.") ¶ 1, at 1 (executed April 26, 2005).

Thereafter, a meeting was held on March 19, 2003, in which several departmental matters were discussed.  See Barber Depo. at 51:7-12; 54:10-19.  Spanish-speaking in the workplace was only one of the topics of discussion during the meeting.  See id.  The parties dispute the characterization of the March 19, 2003 meeting.  Lovelace alleges that Gillean asked that, as a courtesy to other staff members and Hospital patients, employees speak Spanish in the workplace

---

[1]  The Court will not consider the statements for their truth -- that employees actually felt uncomfortable, or that a derogatory comment had actually been made -- but merely to show Gillean's state of mind when the March 19, 2003 meeting was held.

[2] Larrazolo and Barber cite to page 85 of Barber's Deposition for this proposition.  On page 85, Barber testified that, generally, Danzer would comment: "Well, as long as it's patient-related, because employees don't feel comfortable with you talking Spanish around them."  Barber, however, did not testify on page 85 that "at no point" was she told who the complaining employees were, nor did she testify that they were never told that there were derogatory comments made about others. See Barber Depo. at 85.

only for work-related reasons.  See id. at 49:18-51:12; Motion for Summary Judgment ¶ 23, at 7. Larrazolo and Barber contend that Gillean singled them and other Hispanic employees out by stating that they needed "to talk about the Spanish-speaking employees."  Barber Depo. at 50:3-8; Response ¶ 23, at 3.  Gillean went on to state that Lovelace was "asking that you not speak Spanish in the clinic, as the reason being is that it made other employees uncomfortable not knowing what you're saying."  Barber Depo. at 49:18-51:12.

It is undisputed that, at the time of the March 19 meeting, Larrazolo and Barber, along with all of the other Hispanic employees at the Tramway Clinic, were fluent in English.  See Larrazolo Depo. at 52:6-53:19; 131:14-18.  Barber raised her hand during the meeting and asked: "Can you clarify that because we speak Spanish all the time?"  Barber Depo. at 50:9-10.  Gillean responded to her question by stating that Spanish was not allowed in the workplace.  See id. at 50:11-12. Specifically, when Barber asked for clarification, the only answer that Gillean gave was that employees could only speak Spanish if necessary to translate for a patient.  See id. at 50:14-18.

The Plaintiffs argue that Gillean did not state that employees were allowed to speak Spanish on breaks, lunch, etc.  See id.; Response ¶ 25, at 4.  There is no evidence in the record that Gillean specifically told the employees that they could not speak Spanish on breaks or at lunch.  Immediately following the meeting, Barber approached Gillean to obtain further clarification of what had been said in the meeting.  See Barber Dep. at 95:22-96:5.  The Plaintiffs concede that Gillean told Barber after the meeting on March 19, 2003, that she had received complaints from both Rivet and Danzer.  See id. at 94:11-24; 96:6-21.

Barber had no further conversations with Gillean about the Spanish-speaking policy.  See id. at 97:11-23.  While Barber did not have any follow-up discussions with Gillean, the Plaintiffs contend

that they, as well as other employees, felt intimidated by Gillean.  See id. at 44:6-14.

Larrazolo was not present for the meeting.  See Larrazolo Depo. at 85:12-22, 195:12-15. Shortly thereafter, however, Barber had a discussion with Larrazolo in which she told her everything that Gillean had said during the meeting.  See Barber Depo. at 53:10-54:9.  Lovelace contends that Barber told Larrazolo about Gillean's clarification that employees were permitted to speak Spanish to translate for a patient.  See id.; Motion for Summary Judgment ¶ 28, at 8.  The Plaintiffs dispute that Barber made it clear to Larrazolo that she could translate for patients.[3]  Response ¶ 28-34, at 4-5.

Following the March 19, 2003 meeting, Spanish-speaking employees continued to speak Spanish at work, for translation purposes, and on breaks; however, even though they were observed speaking Spanish, Lovelace did not discipline any employee for speaking Spanish at work.  See Barber Depo. at 60:4-8, 86:18-87:18; Larrazolo Depo. at 91:7-15.

**6.      Events after the March 19 Meeting.**

Larrazolo and Barber contend that, after the March 19, 2003 meeting, Lovelace treated them differently.  See Larrazolo Depo. at 212:24-213:3; Response ¶ 11, at 8.  The Plaintiffs allege that Lovelace asked Ginger Tracy to spy on Larrazolo and Barber, and other Spanish-speaking employees, to see if they were speaking Spanish.  See Larrazolo Depo. at 46:20-47:21; Barber Depo. at 58:23-59:5.  They also aver that Gillean asked another co-worker, Cheryl Lopez, to report to her after the meeting regarding how Spanish-speaking employees reacted to news that they could no longer speak Spanish in the workplace and to see if they were still speaking Spanish in the workplace.  See Lopez

_____

[3] The evidence to which Barber and Larrazolo cites does not dispute that Barber told Larrazolo everything that Gillean said at the meeting.  The cited evidence says only that the minutes from the meeting did not clarify that Spanish could be used to translate.  See Larrazolo Depo. at 98-99; 192.

Aff. ¶ 4, at 1; Larrazolo Depo. at 50:1-16; Barber Depo. at 45:13-47:7.  The Plaintiffs state that Lopez also reported to Larrazolo and Barber that they were being watched and to be careful.  See Larrazolo Depo. at 50:5-10.

Lovelace denies the Plaintiffs' contentions.  Lovelace also contends that the support for the Plaintiffs' contention that Tracy was asked to spy on the Plaintiffs is inadmissible hearsay within inadmissible hearsay.  See Defendant's Reply Brief in Further Support of Its Motion for Summary Judgment Filed April 6, 2005 ("Reply") at 2, filed May 16, 2005 (Doc. 47).  Lovelace admits that Lopez testified in her affidavit that she was asked by some unnamed person to "monitor staff to see who was speaking Spanish," but contends that this fact is not probative because Lopez did not disclose who asked her to do this spying.  Id.  Lovelace further contends that it is undisputed that Lovelace did not discipline the Plaintiffs or any other employees for speaking Spanish following the March meeting.  See id.

Larrazolo alleges that Jamie Reed told her that Reed saw Wright taking notes on Larrazolo.  See Larrazolo Depo. at 149:18-24.  Defendants contend that this is inadmissible hearsay.  See Reply at 5.

The Plaintiffs contend that their work was more closely scrutinized than that of other co-workers.  See Barber Depo. at 79:9-84:24.  The Plaintiffs state that Gillean singled out Larrazolo and Barber, and scrutinized their clock and general work duties, including their telephone use, differently than other employees.  See Lopez Aff. ¶ 6, at 2.  Barber argues that her calls were tracked, which is supported by the fact that, when she did speak in Spanish while on the telephone, management would immediately question her why she was speaking Spanish on the telephone.  See Barber Depo. at 79:9-84:24; 88:15-89:6.  Likewise, she stated that, when she would translate for the patients, she would

be interrogated about the nature of her conversation.  See id. at 82:18-84:24.  Other employees commented on how it appeared that Barber's and Larrazolo's work was being watched more closely. See id. at 81:23-82:6; Lopez Aff. ¶ 6, at 2.

Again, Lovelace denies the Plaintiffs' assertions.  Lovelace contends that Lopez' declaration, which the Plaintiffs cite as support for the contention that Gillean singled out the Plaintiffs -- including scrutinizing their clock-in times and telephone calls -- is not based on personal knowledge.  See Reply at 2.  Lovelace also contends that Lopez' statement is too conclusory for the Court to consider.  See id. at 2-3.  Lovelace further denies that Barber's calls were tracked.  See id. at 3.  Barber speculated during her deposition that her personal telephone calls were tracked following the March 19 meeting, because things that were said during her personal calls "were repeated in the clinic."  Barber Depo. at 79:9-84:24.  Barber admitted, however, that the Clinic was a very tight space and that it was almost impossible to be on the telephone without others overhearing the conversation.  See id. Barber further admitted that she spoke with the switchboard manager about the calls being tracked and learned that Lovelace recorded, for quality assurance only, those calls that come into the Clinic for appointments or triage.  See id.  Finally, Lovelace denies that Barber was interrogated about the nature of her Spanish conversations, and contends that the record citation that the Plaintiffs offer does not support the contention.  See Reply at 3.

Barber and Larrazolo have also stated that co-workers and supervisors, including Naomi Bauman and Danzer, followed them outside on their breaks.  See Barber Depo. at 86:24-87:18.  After reentering the facility, Barber would observe the individual who followed them in Gillean's office. See id.  Lovelace admits that Barber testified that she thought she was being followed to see if she was going to speak Spanish; Lovelace maintains however, that it is undisputed that the Plaintiffs

continued to speak Spanish after the March meeting, and neither the Plaintiffs nor any other employees were ever disciplined for speaking Spanish following that meeting. See Reply at 3.

The Plaintiffs also contend that, after the March 19th meeting, their work environment was very tense. See Larrazolo Depo. at 105:3-25; Response ¶ 4, at 7. Lovelace denies this assertion, contending that the Plaintiffs cite no record support for the statement. See Reply at 4. Another employee, Bauman, a Caucasian, became very upset and feared for her job after speaking Spanish after the meeting. See Larrazolo Depo. at 105:3-25. Lovelace admits that Larrazolo testified that Bauman became upset because she felt she might get in trouble for not adhering to the March 19 announcement. See Reply at 4.

The Plaintiffs contend that, after the meeting, Gillean harassed Larrazolo. See Larrazolo Depo. at 99:23-100:8; Response ¶ 5, at 7. Gillean was rude and had other employees watch Larrazolo. See id. This conduct led to Larrazolo contacting the EEOC. See id. Lovelace denies that Gillean harassed Larrazolo, but admits that she felt Gillean was rude to her and felt like other employees were watching her. See Reply at 4.

Larrazolo contends that Gillean unnecessarily questioned her regarding broken drawers in May, 2003. See Larrazolo Depo. at 107:24-108:1. On May 14, 2003, Lovelace allowed Larrazolo to drive 72 miles to Lovelace's Rio Bravo clinic when she was not needed that day. See id. at 108:2-109:16. She also contends that Danzer, the lead nurse at Lovelace's Tramway facility, had been informed the prior morning that Larrazolo was not needed there, but did not inform her. See id. Lovelace admits that Larrazolo testified that she was questioned about broken drawers and drove to Lovelace's Rio Bravo Clinic where it turned out she was not needed. See Reply at 4. Lovelace denies that Danzer knew the day before Larrazolo's trip to the Rio Bravo Clinic that she would not

be needed there, as the record excerpt offered as support for that contention is based on hearsay from an unidentified person at the Rio Bravo Clinic.  See id.

On May 23, 2003, Danzer yelled at Larrazolo in front of co-workers when she accidentally picked up a lunch that was not hers.  See Larrazolo Depo. at 112:15-113:23.  On May 29, 2003, Larrazolo was sent home after a confrontation with Wright, who yelled at Larrazolo in front of a patient.  See Larrazolo Depo. at 113:24-115:22.  Larrazolo was not paid for this time, and Larrazolo does not remember ever seeing Wright yell at Caucasian employees.  See id. at 205:21-23.  Lovelace admits that Larrazolo testified that Danzer was rude to her, that Wright yelled at her, and that she was sent home.  See Reply at 4.  Lovelace contends that Larrazolo admitted, however, that non-Hispanic employees had similar difficulties working with Wright.  See id.; Larrazolo Depo. at 26:25-28:6; 71:10-15.  Larrazolo conceded that several employees of various races had been assigned to work with Wright, including Michele Haskins (Caucasian), Purcell (Caucasian), Snow (Hispanic), and all had difficulty working with Wright and had either asked to transfer or threatened to quit because of her.  See Larrazolo Depo. at 26:25-28:6; 71:10-15.

Wright was not disciplined for yelling at Larrazolo.  See Larrazolo Depo. at 214:2-215:9. Larrazolo contends that, although Larrazolo made a complaint, her complaint was not referred to Human Resources.  See id.  Lovelace admits that Wright was not disciplined in response to Larrazolo's report that Wright had yelled at her.  See Reply at 5.  Lovelace denies, however, Larrazolo's contention that her report that Wright had yelled at her was not referred to Human Resources, as the contention is not supported by the cited record excerpt.  See id.

On June 9, 2003, Gillean called Larrazolo into her office telling Larrazolo that she was not being helpful.  See Larrazolo Depo. at 120:12-121:8.  On June 12, 2003, Larrazolo was called in to

speak with Danzer and Naomi Campbell because she had asked a patient who was in a lot of pain for his weight rather than actually weighing him.  See id. at 121:19-122:21.  The patient needed crutches, and Danzer and Campbell told Larrazolo that she had to have a specific weight to select the right crutches.  See id.  Larrazolo contends that a person's height is needed to select crutches and not a person's weight.  See id.

7. <u>Pat-on-the-Back Awards</u>.

Lovelace has a program which enables employees and managers to say thank-you to other employees with a small award, known as "Pat on the Back" awards.  See Eichenberg Decl. ¶ 9, at 2. Any provider or manager, which would include Wheeler and Dr. Steichen, with whom Larrazolo and Barber worked, can hand out "Pat on the Back" awards.  See Barber Depo. at 126.  Employees can also ask their manager to give an award to a co-worker.  See Eichenberg Decl. ¶ 9, at 2-3.  These awards do not affect an employee's compensation, and the absence of such awards is not a reason for discipline.  See id.; Barber Depo. at 129:24-130:6.

Barber and Larrazolo complain that, on one instance, after the March 19 meeting, "Pat on the Back" awards were handed out, by Gillean and Coffey, in front of a group of employees, and none of the Hispanic employees received an award on that occasion.  See Barber Depo. at 126:1-128:9. Barber contends that Lovelace had not handed out the awards in front of a group of employees before that date.  See id.

8. <u>Larrazolo's Refusal to Translate for a Patient</u>.

Lovelace had called upon Larrazolo to translate "hundreds" of times since her employment started.  See Larrazolo Depo. 193:21-94:6.  Lovelace had asked Barber before the March 19, 2003 meeting to translate for a Spanish-speaking patient.  See Barber Depo. at 137:16-19.  On April 17,

-14-

2003, Larrazolo told Wheeler that she was not allowed to interpret in Spanish for a patient.  <u>See</u>
Larrazolo Depo. at 95:16-96:9.  Jennifer Hall then told Danzer, who informed Gillean.  <u>See</u> <u>id.</u>

Larrazolo was written up and threatened with termination for "further acts of
insubordination."  <u>Id.</u> at 192:7-20; Corrective Action Procedure Form (dated April 17, 2003).  As
a result of Larrazolo's refusal to translate, Gillean issued Larrazolo a Step 2 written reprimand on
April 17, 2003.  <u>See</u> Larrazolo Depo. at 94:24-97:4; Corrective Action Procedure Form (dated April
17, 2003).  Because she had received a Step 1 written remand on January 14, 2003, a Step 2 was the
next step in the progression.  <u>See</u> Eichenberg Decl. ¶ 17, at 4.

Gillean explained to Larrazolo that she was being written up for insubordination for refusing
to interpret, that she had "one foot out the door," and that, although Larrazolo was absent from the
March 19, 2003 meeting, she should have read the meeting's minutes.  Larrazolo Depo. at 95:16-
98:14.  If an employee cannot attend a departmental meeting, he or she is required to obtain the
agenda, handouts, and minutes for the meeting so that he or she "remains apprised of departmental
policies and procedures."  Eichenberg Decl. ¶ 8, at 2.

Larrazolo then asked for a copy of the minutes from the March 19, 2003 meeting.  <u>See</u>
Larrazolo Depo. at 98:4-18.  After being written up, Larrazolo reviewed the minutes of the meeting
held on March 19, 2003.  <u>See</u> <u>id.</u> at 98:4-99:3.  It was not clear from the minutes that employees
could speak Spanish to translate.  <u>See</u> <u>id.</u>  In reviewing the minutes of the March 19 meeting,
however, it sounded to Larrazolo as if Spanish was "flat out" disallowed.  <u>See</u> <u>id.</u>

Gillean has since conceded that it was not clear from the minutes that speaking Spanish for
the purpose of translating to patients was allowed.  <u>See</u> Eichenberg Decl. ¶ 14, at 4.  Gillean later
discovered that, although she had informed employees at the March 19 meeting that they were

permitted to speak Spanish for the purpose of translating for patients, the recorded minutes did not

reflect this modification. See id. Accordingly, and subsequently, on June 1, 2003, Gillean revoked

and rescinded the corrective action and reprimand that had been issued to Larrazolo on April 17,

2003. See id. at 102:20-103:21; 120:6-9. Lovelace maintains that Larrazolo had known through her

conversation with Barber that translating for patients was allowed. See Motion for Summary

Judgment ¶ 28, at 8; Barber Depo. at 54:5-9.

### 9.    Plaintiffs' Charges of Discrimination.

On April 28, 2003, Barber filed a charge of discrimination with the EEOC, alleging national

origin discrimination and retaliation. See Barber Depo. at 68:15-25; Barber Charge of Discrimination

(dated April 28, 2003). Barber alleged that she felt discriminated against, based on her national

origin, when Gillean instructed employees at the March 19 meeting "not to speak Spanish unless it

was to translate for patients." Charge of Discrimination (dated April 28, 2003). On May 6, 2003,

Larrazolo filed a charge of discrimination alleging national origin discrimination and retaliation. See

Larrazolo Depo. at 110:3-111:11; Larrazolo Charge of Discrimination (dated May 6, 2003).

Larrazolo alleged that the March 19 announcement concerning speaking Spanish in the workplace

was discriminatory against Hispanics. See Charge of Discrimination (dated May 6, 2003). She

further alleged that Lovelace retaliated against her, disciplined her, and scrutinized her much closer

than it did non-Hispanic employees. See id.

Eichenberg received notice of the two charges on May 7, 2003, and she was the first

representative to receive notice of the charges. See Eichenberg Decl. ¶¶ 11, at 3. She informed

Gillean that same day. See id. Eichenberg did not inform anyone else at Lovelace. See id.

Before filing her charge on May 6, 2003, Larrazolo had not complained to Eichenberg,

Gillean, Coffey, Wheeler, or anyone else in management about what had been said at the March 19, 2003 meeting, nor had she reported to anyone in management that she felt that Lovelace was discriminating against her.  See Larrazolo Depo. at 93:14-94:1; 100:9-15; 151:21-25.  While Larrazolo never complained internally, she was very standoffish about complaining, because she is a single parent with two children to support.  See id. at 99:13-21.  Barber, however, used Lovelace's Compliance Department, calling Lovelace's employee complaint hotline in April, 2003.  See Barber Depo. at 72:5-74:7.

On May 27, 2003, the EEOC conducted an onsite investigation with respect to the charges that Larrazolo and Barber filed.  See Eichenberg Decl. ¶ 13, at 3.  In conducting the onsite investigation, co-workers reported to Larrazolo and Barber that Gillean coached them how to respond to any questions the EEOC investigators might ask.  See Barber Depo. at 131:2-132:24.

The EEOC issued Notice of Right to Sue Letters to Barber and Larrazolo on February 4, 2004.  See Barber Depo. at 22:16-23:16; Notice of Right to Sue (dated February 4, 2004); Larrazolo Depo. at 128:2-12.  While the EEOC issued Barber and Larrazolo their Right to Sue Notices, the EEOC also issued a finding of Reasonable Cause, stating that there was reasonable cause to believe that a violation of Title VII had occurred.  See Barber Finding of Probable Cause at 1 (dated February 4, 2004); Larrazolo Finding of Probable Cause at 1 (dated February 4, 2005).

## 10.   Barber's Voluntary Resignation.

Barber voluntarily resigned her employment, "with sincere regret," on July 22, 2003, stating that she had "enjoyed and valued her position [at the Hospital] and was very fond of all [her] fellow co-workers."  Barber Depo. at 118:9-119:12; Letter of Resignation from Barber to Roy Bean (dated July 22, 2003).  Gillean was no longer employed at the Tramway Clinic at the time Barber resigned

her employment.  See Barber Depo. at 32:7-9.  Barber contends that, while she resigned her employment, she did so because of the conditions of her employment with Lovelace.  See id. at 112:5-114:19.

As of the date she submitted her resignation letter, Barber had received an offer of employment from New Mexico Spine.  See id. at 119:13-23.  Barber's starting rate of pay at New Mexico Spine was to be $14.00 per hour.  See id. at 106:11-19.  Barber's last rate of pay at Lovelace Sandia was $11.71 per hour.  See id. at 107:8-10.

While Barber makes more money at her current job, her benefits are not as good.  See id. at 134:21-136:13.  She maintains that, if not for her work environment, she would have remained at her job with Lovelace.  See id. at 115:6-12.  Barber also admits that she would not have quit her job at Lovelace if she had not had another job offer, and that the increased pay at the other job influenced her decision.  See id. at 114:22-117:16.  When Barber resigned, she was eligible for rehire at Lovelace.  See id. at 120:1-24; Human Resources Information Form (dated July 23, 2003).

Barber alleges that she suffered serious health problems in connection with the stress she was experiencing at work.  She alleges that she began seeing a doctor and was proscribed Paxil for the first time in her life.  See id. at 177:1-178:9.  She alleges that she began having migraine headaches more frequently.  See id.  Barber alleges that she still experiences stress because of her former employment.  See id.

### 11.    **Larrazolo's Transfer to the Montgomery Clinic.**

Larrazolo requested that she be placed with Dr. Steichen after Dr. Steichen had asked that Larrazolo be assigned to work with him as an MA.  See Larrazolo Depo. at 24:5-23.  Larrazolo contends that Dr. Greenberg and Danzer did not allow Larrazolo to work for Dr. Steichen.  See id.

Lovelace contends that Danzer made the decision to place Snow in Barber's former assignment with Dr. Steichen after Snow's position was eliminated.  See id. at 24:5-26:9; 118:3-17.  While Larrazolo wanted to work with Dr. Steichen following Barber's resignation, Tracy Snow was placed with Steichen.  See id.; Barber Depo. at 99:17-20.  Larrazolo contends that Snow is a less qualified MA. See Larrazolo Depo. at 25:3-26:9.

Larrazolo transferred to Lovelace's Montgomery Clinic on August 17, 2003, to work as a MA, and Lovelace continues to employ her.  See id. at 17:21-24; 124:4-125:24.  Larrazolo works with Dr. Lopez-Colbert at the Montgomery Clinic and enjoys her work at the Montgomery Clinic. See id. at 125:24-127:25.  Larrazolo holds the same job title, earns the same rate of pay, and works the same amount of hours at the Montgomery Clinic as she did at the Tramway Clinic.  See id. at 124:7-11

Larrazolo voluntarily transferred to the Montgomery Clinic.  See id. at 129:24-130:2.  While Larrazolo had previously put in her resignation, she rescinded it.  See id. at 143:25-145:20. Larrazolo contends that, rather than resigning, she transferred to Montgomery because of the treatment she was receiving at Lovelace's Tramway clinic.  See id. at 217:23-25.[4]

Plaintiffs also contend that five other Hispanic employees left the Tramway clinic because of unfair treatment.  See id. at 238:22-239:6.

## PROCEDURAL BACKGROUND

Larrazolo, a current Lovelace employee, and Barber, a former Lovelace employee, assert claims of national origin discrimination, retaliation, breach of contract, and breach of the covenant

---

[4] Plaintiffs cite the Court to pages 217-218 in support of this contention.  See Response ¶ 49, at 6.  Page 218 of Larrazolo's deposition, however, was not included in any of the exhibits on the record before the Court.

of good faith and fair dealing.[5]  <u>See</u> Complaint for Damages and Jury Demand ("Barber Complaint") at 4-8, filed May 4, 2004 (Doc. 1 in Case No. CV04-486); Complaint for Damages and Jury Demand ("Larrazolo Complaint") at 5-8, filed May 22, 2004 (Doc. 1 in Case No. CV04-447).  Barber also alleges a claim for constructive discharge.  <u>See</u> Barber Complaint at 6.  Lovelace requests that summary judgment be granted in its favor on Barber's and Larrazolo's claims.  <u>See</u> Motion for Summary Judgment at 30.

## SUMMARY JUDGMENT STANDARD

Rule 56 of the Federal Rules of Civil Procedure provides for entry of summary judgment where "there is no genuine issue as to any material fact" and the defendant is "entitled to judgment as a matter of law."  Fed. R. Civ. P. 56(c).  "Summary judgment is appropriate if 'the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law."  <u>Thomas v. IBM</u>, 48 F.3d 478, 484 (10th Cir. 1995).  In applying this standard, the record and reasonable inferences therefrom are viewed in the light most favorable to the party opposing summary judgment.  <u>See</u> <u>McKnight v. Kimberly Clark Corp.</u>, 149 F.3d 1125, 1128 (10th Cir. 1998)(citing <u>Applied Genetics Int'l, Inc. v. First Affiliated Sec. Inc.</u>, 912 F.2d 1238, 1241 (10th Cir. 1990)).

The moving party has the initial burden of demonstrating the absence of a genuine issue of material fact.  <u>See</u> <u>Celotex Corp. v. Catrett</u>, 477 U.S. 317, 323 (1986).  Where the movant will not bear the burden of proof at trial, this burden may be met by pointing to "a lack of evidence for the

---

[5]  Plaintiffs have stipulated to the dismissal of their breach of contract and breach of the covenant of good faith and fair dealing claims.  <u>See</u> Plaintiffs Response to Defendants Motion for Summary Judgment ("Response") at 22, filed April 27, 2005 (Doc. 46).

nonmovant on an essential element of the nonmovant's claim." Adler v. Wal-Mart Stores, Inc., 144 F.3d 664, 671 (10th Cir. 1998)(citing Celotex Corp. v. Catrett, 477 U.S. at 325).  Once the moving party meets its burden, "the burden shifts to the nonmovant to go beyond the pleadings and set forth specific facts that would be admissible in evidence in the event of trial from which a rational trier of fact could find for the nonmovant."  Id.

The opposing party may not rest upon mere allegations and denials in the pleadings, but must set forth specific facts showing that there is a genuine issue for trial. See Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 248 (1986)(citation omitted).  An issue of fact is genuine if the evidence is significantly probative or more than merely colorable such that a jury could reasonably return a verdict for the non-moving party. See id. at 249.  Summary judgment is appropriate against any party who "fails to make a showing sufficient to establish the existence of an element essential to that party's case, and on which that party will bear the burden of proof at trial." Celotex Corp. v. Catrett, 477 U.S. 317 at 322.  "The nonmoving party must go beyond the pleadings and establish, through admissible evidence, that there is a genuine issue of material fact that must be resolved by the trier of fact." Panis v. Mission Hills Bank, N.A., 60 F.3d 1486, 1490 (10th Cir. 1995)(citation omitted). The court must disregard statements of mere belief.  See Tavery v. U.S., 32 F.3d 1423, 1427 n.4 (10th Cir. 1994)(citing Automatic Radio Mfg. Co. v. Hazeltine Research, 339 U.S. 827, 831 (1950)). The existence of a mere scintilla of evidence is insufficient to support the nonmoving party's position. See Anderson v. Liberty Lobby, Inc., 477 U.S. at 252.  "Hearsay testimony cannot be considered because a third party's description of a witness' supposed testimony is 'not suitable grist for the summary judgment mill.'"  Wright-Simmons v. Okla. City, 155 F.3d 1264, 1268 (10th Cir. 1998)(quoting Thomas v. IBM, 48 F.3d at 485).

-21-

## LAW REGARDING DISCRIMINATION AND RETALIATION

### 1. McDonnell Douglas Framework.

Where Title VII claims of discrimination rest on indirect evidence, the claims are subject to the burden-shifting framework that the Supreme Court of the United States established in McDonnell Douglas Corp. v. Green, 411 U.S. 792 (1973). See Goodwin v. GMC, 275 F.3d 1005, 1011-12 (10th Cir. 2002)("[Plaintiff] may show discrimination . . . via the indirect McDonnell Douglas burden-shifting method.")(citation omitted). The same is true for Title VII retaliation claims. See Pastran v. K-Mart Corp., 210 F.3d 1201, 1205-06 (10th Cir. 2000)("Retaliation claims under Title VII are subject to the burden-shifting analysis of McDonnell Douglas Corp. v. Green . . .")(citing Jones v. Denver Post Corp., 203 F.3d 748, 752 (10th Cir. 2000)). Under McDonnell Douglas, the establishment of a prima facie case of discrimination creates a presumption that the employer unlawfully discriminated or retaliated against the employee. See St. Mary's Honor Center v. Hicks, 509 U.S. 502, 506 (1993)(citing Texas Dept. of Community Affairs v. Burdine, 450 U.S. 248, 254 (1981)). In turn, this "presumption places upon the defendant the burden of producing an explanation to rebut the prima facie case." Id. at 506-507.

Once the defendant has met its burden, the presumption of unlawful discrimination "drops from the case." Id. at 507. The plaintiff then bears the ultimate burden of persuading the trier of fact that the defendant unlawfully discriminated or retaliated against him. See id. The plaintiff prevails either directly by proving that the defendant acted with discriminatory motive or indirectly by showing that the stated reason for its action was a pretext for discrimination, i.e., the facially non-discriminatory reason was a cover-up for a decision motivated by unlawful discrimination. See EEOC v. Flasher Co., 986 F.2d 1312, 1317 (10th Cir. 1992)(citation omitted).

2.   **National Origin Discrimination.**

To establish a prima facie claim of disparate treatment based on national origin or color, the plaintiff must show: (i) that he is a member of a protected class; (ii) that he suffered adverse employment action; and (iii) disparate treatment among similarly situated employees.  Orr v. City of Albuquerque, 417 F.3d 1144, 1149 (10th Cir. 2005).[6]  The third prong can be met by showing evidence sufficient to raise an inference of discrimination.  See id. at 1152 ("The female Plaintiffs' evidence is sufficient to raise an inference of discrimination because they have 'presented admissible evidence that Defendant treated at least one non-pregnant employee . . . more favorably than [them].'")(quoting EEOC v. Horizon/CMS Healthcare Corp., 220 F.3d 1184, 1197 (10th Cir. 2000)).

There is nothing inherently discriminating about English-only policies established for legitimate business reasons.  See, e.g., Garcia v. Gloor, 618 F.2d 264, 272 (5th Cir. 1980)(holding that neither Title VII nor common understanding equates national origin with the language that one chooses to speak); Sanchez v. City of Altus, No. CIV-03-336-R, 2004 U.S. Dist. LEXIS 3252, (W.D.Okla. February 20, 2004); Cosme v. Salvation Army, 284 F.Supp. 2d 229, 239-240 (D. Mass. 2003)(holding that an English-only rule that prevents some employees, like the plaintiff, from exercising a preference to converse in Spanish does not convert the policy into discrimination based on national origin).  The EEOC has determined that a rule requiring employees to speak only English,

---

[6] The United States Court of Appeals for the Tenth Circuit has sometimes framed the third element more broadly as "circumstances giving rise to an inference of discrimination."  Sorbo v. United Parcel Serv., Nos. 03-1455, 04-1251, 05-10162005, 2005 U.S. App. LEXIS 28792, at *8 (10th Cir. December 28, 2005)(citations omitted).  This broader requirement may, however, be shown by proof that the employer treated similarly situated employees more favorably.  See id. at *9.  Because the Plaintiffs have framed their prima facie test with the similarly situated element, and have chosen to attempt to establish their prima facie case using the similarly situated element, the Court will discuss their prima facie case in terms of such element.

when applied at all times, is presumed to violate Title VII and a English-only rule when applied only

sometimes is permissible if based on business justification.  See C.F.R. § 1606.7(a) and (b)(1980).

Several courts, however, have found English-only policies as applied to bilingual employees do not,

alone, violate Title VII.  See Garcia v. Spun Steak, 998 F.2d 1480, 1490 (9th Cir. 1993); Olivarez

v. Centura Health Corp., 203 F.Supp.2d 1218 (D. Colo. 2002).

      **3.**    **Retaliation.**

      Title VII prohibits retaliation against employees for opposing any practice made unlawful by

Title VII, or for asserting a charge, testifying, assisting, or participating in any manner in an

investigation, proceeding, or hearing under Title VII.  See Gunnell v. Utah Valley State College, 152

F.3d 1253, 1262 (10th Cir. 1998)(citation omitted).  To establish a prima facie case of retaliation, the

plaintiff must show that: (i) the plaintiff engaged in protected opposition or participated in a Title VII

proceeding; (ii) the employer took an adverse employment action against the plaintiff subsequent to

the protected activity; and (iii) there is a causal connection between the plaintiff's participation in the

protected activity and the adverse employment action taken by the employer.  See Mattioda v. White,

323 F.3d 1288, 1293 (10th Cir. 2003)(citing Love v. Re/Max of America, Inc., 738 F.2d 383, 385

(10th Cir. 1984)).  To establish a causal connection by temporal proximity, the plaintiff may adduce

evidence justifying an inference of retaliatory motive by showing protected conduct followed closely

by an adverse action.  See Conner v. Schnuck Markets, Inc., 121 F.3d 1390, 1395 (10th Cir.

1997)("Unless the termination is very closely connected in time to the protected conduct, the plaintiff

will need to rely on additional evidence beyond mere temporal proximity to establish

causation.")(citation omitted).  To establish a causal connection, the plaintiff must show that the

management personnel responsible for making the decision had knowledge of the plaintiff's protected

acts.   See Williams v. Rice, 983 F.2d 177, 181 (10th Cir. 1993)(quoting Anderson v. Phillips

Petroleum Co., 861 F.2d 631, 635 (10th Cir. 1988)).

### 4.      **Legitimate Non-discriminatory Explanation.**

The presumption that arises once a plaintiff has established a prima facie case places upon the

defendant the burden of producing an explanation to rebut the prima facie case.   See St. Mary's

Honor Center v. Hicks, 509 U.S. at 506-507.   This burden is "one of production, not persuasion."

Reeves v. Sanderson Plumbing Products, Inc., 530 U.S. 133, 142 (2000)(citation omitted). To satisfy

its burden, the defendant need only articulate "through some proof" a facially non-discriminatory

explanation.   EEOC v. Flasher Co., 986 F.2d at 1316 (citations omitted); Panis v. Mission Hills Bank,

N.A., 60 F.3d at 1490-91.   The defendant is not, at this stage of the proceedings, obligated to litigate

the merits of its reasoning nor prove that the "reason relied upon was bona fide."   EEOC v. Flasher

Co., 986 F.2d at 1316.   See also Panis v. Mission Hills Bank, N.A., 60 F.3d at 1491 (citation

omitted).   The reasoning must be reasonably specific and clear.   EEOC v. Flasher Co., 986 F.2d at

1316.

### 5.      **Pretext.**

The ultimate burden that is placed on the plaintiff, once the defendant has met its burden of

offering a legitimate non-discriminatory reason for the action, is met either directly by proving that

the defendant acted with discriminatory motive or indirectly by showing that the stated reason for its

action was a pretext for discrimination, i.e., the facially non-discriminatory reason was a "cover-up

for a decision motivated by unlawful discrimination."   EEOC v. Flasher Co., 986 F.2d at 1317

(quoting McDonnell Douglas Corp. v. Green, 411 U.S. at 804-05).   Pretext can be shown "by

producing evidence of 'such weaknesses, implausibilities, inconsistencies, incoherencies, or

contradictions in the employer's proffered legitimate reasons for its action that a reasonable factfinder could rationally find them unworthy of credence and hence infer that the employer did not act for the asserted non-discriminatory reasons.'" Jaramillo v. Colo. Judicial Dep't, 427 F.3d 1303, 1308 (10th Cir. 2005)(quoting Morgan v. Hilti, Inc., 108 F.3d 1319, 1323 (10th Cir. 1997)).

### TENTH CIRCUIT LAW REGARDING CONSTRUCTIVE DISCHARGE

"A plaintiff may satisfy the third prong [of McDonell Douglas] by demonstrating that he was constructively discharged." Baca v. Sklar, 398 F.3d 1210, 1216 (10th Cir. 2005). The Tenth Circuit has recognized that "[a] claim of constructive discharge is . . . cognizable under Title VII." Thomas v. Denny's, Inc., 111 F.3d 1506, 1514 (10th Cir. 1997). "'Constructive discharge occurs when the employer by its illegal discriminatory acts has made working conditions so difficult that a reasonable person in the employee's position would feel compelled to resign. Essentially, a plaintiff must show that she had *no other choice* but to quit.'" Sandoval v. Boulder Reg'l Communs. Ctr., 388 F.3d 1312, 1325 (10th Cir. 2004)(emphasis in original)(quoting Sanchez v. Denver Public Schools, 164 F.3d 527, 534 (10th Cir. 1998)). While "[a] finding of constructive discharge may be based in part on a discriminatory act such as a failure to promote for discriminatory reasons," the court must conclude that there are also "aggravating factors that make staying on the job intolerable." Bennett v. Quark, Inc., 258 F.3d 1220, 1229 (10th Cir. 2001)(citations omitted).

The court disregards both "the employee's subjective view of the workplace environment and the employer's subjective intentions regarding the employee." Baca v. Sklar, 398 F.3d at 1216 (citing Jeffries v. Kansas, 147 F.3d 1220, 1233 (10th Cir. 1998)). Instead, "'[t]he conditions of employment must be objectively intolerable.'" Sandoval v. Boulder Reg'l Communs. Ctr., 388 F.3d at 1325 (citation omitted). Even if the employee resigns "of her own free will" as a result of the employer's

conduct, the plaintiff cannot prevail on constructive discharge unless the employee had no "other reasonable choice but to resign in light of those actions." Tran v. Trs. of the State Colleges in Colo., 355 F.3d 1263, 1270 (10th Cir. 2004)(citation omitted). The Tenth Circuit has concluded that "the bar is quite high in [constructive discharge] cases." Garrett v. Hewlett-Packard Co., 305 F.3d 1210, 1221 (10th Cir. 2002)(citing Sanchez v. Denver Public Schools, 164 F.3d at 534).

## LAW REGARDING TITLE VII EXHAUSTION

The Tenth Circuit has stated that "[a] plaintiff must generally exhaust his or her administrative remedies prior to pursuing a Title VII claim in federal court." Simms v. Oklahoma ex rel. Dep't of Mental Health & Substance Abuse Servs., 165 F.3d 1321, 1326 (10th Cir. 1999)(citing Khader v. Aspin, 1 F.3d 968, 970 (10th Cir. 1993)). "[E]ach discrete retaliatory action constitutes its own 'unlawful employment practice for which administrative remedies must be exhausted.'" Annett v. Univ. of Kan., 371 F.3d 1233, 1238 (10th Cir. 2004)(citing Martinez v. Potter, 347 F.3d 1208, 1210 (10th Cir. 2003)). Satisfying this exhaustion requirement "is a jurisdictional prerequisite to suit under Title VII" and failure to do so "is a jurisdictional bar." Sizova v. Nat'l Inst. of Stds. & Tech., 282 F.3d 1320, 1325 (10th Cir. 2002)(citations omitted). The purpose of this requirement is "to protect employers by giving them notice of the discrimination claims being brought against them, in addition to providing the EEOC with an opportunity to conciliate the claims." Foster v. Ruhrpumpen, Inc., 365 F.3d 1191, 1195 (10th Cir. 2004)(citing Manning v. Chevron Chem. Co., 332 F.3d 874, 878 (5th Cir. 2003)).

## NEW MEXICO LAW REGARDING CONSTRUCTIVE DISCHARGE

"An employee must allege facts sufficient to find that the employer made working conditions so intolerable, when viewed objectively, that a reasonable person would be compelled to resign."

Gormley v. Coca-Cola Enters., 137 N.M. 192, ___, 109 P.3d 280, 282-83 (2005)(citing Derr v. Gulf Oil Corp., 796 F.2d 340, 344 (10th Cir. 1986)). "Essentially, a plaintiff must show that she had no other choice but to quit." Gormley v. Coca-Cola Enters., 137 N.M. at ___, 109 P.3d at 283 (quoting Yearous v. Niobrara County Mem'l Hosp., 128 F.3d 1351, 1356 (10th Cir. 1997)). "'The bar is quite high' for proving constructive discharge." Gormley v. Coca-Cola Enters., 137 N.M. 192 at ___, 109 P.3d at 283 (quoting Garrett v. Hewlett-Packard Co., 305 F.3d 1210, 1221 (10th Cir. 2002)).

## ANALYSIS

The Court finds that many of the Plaintiffs' claims are barred because they failed to exhaust administrative remedies for discrete acts. Although the Court will assume, for purposes of summary judgment, that the Plaintiffs can establish a prima facie case of disparate treatment concerning the no-Spanish policy, Lovelace has articulated a legitimate and non-discriminatory reason for the policy, and the Plaintiffs have not shown pretext. Also, for each of their remaining claims of discrimination, the Plaintiffs on all claims fail to show that an adverse employment action has occurred. Additionally, the Plaintiffs are not able to establish a prima facie case of retaliation for the actions of which they complain. Finally, Barber is not able to establish a state law claim for constructive discharge. Lovelace is therefore entitled to judgment as a matter of law on all claims.

## I.   THE PLAINTIFFS HAVE FAILED TO EXHAUST THE ADMINISTRATIVE REMEDIES FOR MANY OF THEIR CLAIMS.

The Tenth Circuit has stated that "[a] plaintiff must generally exhaust his or her administrative remedies prior to pursuing a Title VII claim in federal court." Simms v. Oklahoma ex rel. Dep't of Mental Health & Substance Abuse Servs., 165 F.3d at 1326. "[E]ach discrete retaliatory action constitutes its own 'unlawful employment practice for which administrative remedies must be

-28-

exhausted.'" <u>Annett v. Univ. of Kan.</u>, 371 F.3d at 1238.  Satisfying this exhaustion requirement "is

a jurisdictional prerequisite to suit under Title VII" and failure to do so "is a jurisdictional bar."

<u>Sizova v. Nat'l Inst. of Stds. & Tech.</u>, 282 F.3d at 1325.

      **1.**      **Barber Included the English-Only Policy Complaint, her Contention that Her Calls were Tracked and Recorded, and her contention that her Work was Watched more Closely, in Her EEOC Charge.**

Barber's complaint against the English-only Policy, her contention that her calls were tracked

and recorded, and her contention that her work was watched more closely, are not barred for failure

to exhaust.  Barber specifically included these complaints in the EEOC charge that she filed on April

28, 2003.  <u>See</u> Barber Charge of Discrimination.  The Court will consider these complaints on the

merits.

      **2.**      **Larrazolo Included in her EEOC Charge the Prohibition Against Speaking Spanish, Employees Being Written Up, and Her Work Being More Closely Scrutinized.**

Larrazolo's complaint against the prohibition on speaking Spanish, as well as the fact that

people were being written up, and her belief that her work was more closely scrutinized, are not

barred for failure to exhaust.   Larrazolo specifically included these complaints in her EEOC charge

that she filed on May 6, 2003.  <u>See</u> Larrazolo Charge of Discrimination.  The court will consider

these complaints on the merits.

      **3.**      **Larrazolo has not Exhausted her Administrative Remedies for Being Sent Home Without Pay, Driving 72 miles to Lovelace's Rio Bravo Clinic, Being Denied "Pat on the Back" Awards, Being Questioned for not Getting Patient's Weight Right, Being Denied Placement with Dr. Steichen, Being Forced to Work With Wright, and Being Yelled at for Picking up the Wrong Lunch.**

Larrazolo points to the following as evidence of adverse employment action: (i) Larrazolo was

"spied on" by Tracy and Lopez, and their work was more closely scrutinized; (ii) Larrazolo was written up for refusing to speak Spanish to translate; (iii) Larrazolo was denied placement with Dr. Steichen; (iv) Larrazolo was forced to work with Wright; (v) after complaining about Wright yelling at her in front of a patient, Larrazolo was sent home without pay and without explanation; (vi) Larrazolo was followed on break, outside the facility; (vii) Gillean "was rude to Larrazolo," and accused her of "not being helpful"; (viii) Larrazolo was questioned for not getting a patient's weight when the patient was in pain; (ix) Gillean questioned Larrazolo regarding broken drawers; (x) Larrazolo drove 72 miles to Lovelace's Rio Bravo Clinic and her Supervisor did not inform her that she was not needed there; (xi) Larrazolo was yelled at after she picked up someone else's lunch; and (xii) Larrazolo was denied "Pat on the Back" awards.  Response at 15.

Larrazolo filed an EEOC charge on May 6, 2003.  See Larrazolo Charge of Discrimination. Larrazolo did not file another EEOC charge subsequent to the May 2003 charge.  Larrazolo did not include in the EEOC charge many of the actions of which she now complains.  If the Court considers these actions discrete, they are barred because of failure to exhaust administrative remedies.  See Annett v. Univ. of Kan., 371 F.3d at 1238.  The Plaintiffs argued at the hearing that the facts they alleged were not discrete acts, but were more like actions alleged in a hostile environment claim.  See Transcript of Hearing at 15:17-24.[7]  The Plaintiffs relied on Nat'l Railroad Passenger Corp. v. Morgan, 536 U.S. 101, 128 (2002), where the Supreme Court of the United States held that "[a] charge alleging a hostile work environment claim . . . will not be time barred so long as all acts which constitute the claim are part of the same unlawful employment practice and at least one act falls

---

[7] The Court's citations to the transcript of the hearing refer to the Court Reporter's original, unedited version.  Any final transcript may contain slightly different page and/or line numbers.

within the time period."   The Tenth Circuit has interpreted Morgan as "specifically provid[ing] that the hostile work environment underlying a Title VII claim may include acts taking place after the plaintiff files an EEOC charge if those acts contribute to the same hostile work environment that existed during the filing period."   Duncan v. Manager, Dep't of Safety, 397 F.3d 1300, 1310 (10th Cir. 2005).   To determine which acts are more analogous to a hostile work environment claim, the court will look at the typicality of the action, the frequency of the action, and the people involved in the action.   See id. at 1309 ("These acts are related by type, frequency, and perpetrator, thus all these acts, including those before the beginning of the filing period, are within the scope of the plaintiff's hostile work environment claim.")(citing Nat'l Railroad Passenger Corp. v. Morgan, 536 U.S. at 120).

The Court finds that the following actions of which Larrazolo complains appear to be more analogous to a hostile work environment claim and as such are not discrete and are not barred for failure to exhaust: (i) being "spied" on; (ii) being written up for not translating in Spanish; (iii) being followed outside on break; (iv) being accused of not being helpful by Gillean as well as Gillean being rude to Larrazolo; and (v) being questioned by Gillean about the broken drawers.

The contention that Larrazolo was "spied on," that she was written up for refusing to translate Spanish, that she was followed outside on her breaks, that she was questioned unnecessarily by Gillean about broken drawers, and that Gillean was rude to her and accused her of not being helpful are all related in typicality, frequency, and/or by perpetrator.   Larrazolo contends that she was spied on to see if she was speaking Spanish; that she was followed outside on breaks to see if she was speaking Spanish, after which those that followed her returned to Gillean's office; that Gillean questioned her about broken drawers; and that Gillean was rude to her.   These all either involve the

same subject matter -- the Spanish policy -- or the same perpetrator -- Gillean committed them. They are also related in that the confrontations with Gillean appear to occur somewhat frequently, as well as the issues surrounding Spanish-speaking. The Court believes that these are all sufficiently related to be analogous to a hostile work environment claim, and as such are not barred for failure to exhaust.

The Court believes that the following are discrete acts and as such are barred because of Larrazolo's failure to exhaust administrative remedies: (i) being sent home for the day without pay; (ii) driving 72 miles to a clinic when not needed; (iii) being denied "Pat on the Back" awards; (iv) being questioned for not getting a patient's weight; (v) being denied placement with Dr. Steichen, as well as being forced to work with Wright; and (vi) being yelled at for picking up the wrong lunch.

These actions are not related in typicality or by perpetrator. They also are not repetitive type actions, but appear to be more random. Larrazolo was sent home for the day without pay by Brenda Coffey; she contends that Danzer should have told her that she was not needed at the Rio Bravo Clinic; Coffey and Gillean did not give her a "Pat on the Back" award; Dr. Greenberg and Danzer denied her placement with Dr. Steichen; she was yelled at by Danzer for picking up the wrong lunch; and Campbell and Danzer questioned her for not getting a patient's weight correctly. The Court believes that these actions are not sufficiently related by typicality, frequency, or by perpetrator, to be analogous to a hostile work environment claim. These actions appear to be more random, and unrelated in subject matter or by perpetrators, than those discussed as being analogous to a hostile work environment claim. These involve different people, and appear more to be isolated incidents. Because these are discrete acts, they are barred for failure to exhaust administrative remedies.

4.    **Barber has not Exhausted her Administrative Remedies for Being Denied "Pat on the Back" Awards or for Receiving a Write-up for Working Through Lunch.**

Barber points to the following as evidence of adverse employment action: (i) Barber received a write up for working through lunch even though her supervisor instructed her to do so if there was no one there to cover Barber's shift; (ii) Barber was constructively discharged; (iii) Barber was "spied on" by co-workers; (iv) Barber's work was closely scrutinized; (v) Barber's calls were tracked, and when she translated for Spanish-speaking patients she was questioned about the nature of her conversation; and (vi) Barber did not receive any "Pat on the Back" awards.  See Response at 14.

Barber filed an EEOC charge on April 28, 2003.  Barber did not include in the EEOC many of the actions about which she now complains.  If the Court considers these actions as discrete, they are barred because of failure to exhaust administrative remedies.  See Annett v. Univ. of Kan., 371 F.3d at 1238.

The Court believes that the following actions of which Barber complains are more analogous to a hostile work environment claim, and as such are not barred for failure to exhaust: (i) being constructively discharged; and (ii) being "spied on."  The facts underlying the constructive discharge claim -- gossip surrounding Spanish-speaking, being asked if she was going to ever speak Spanish again, and being watched -- and the contention that she was "spied on" to see if she was speaking Spanish, and how she reacted to the Spanish policy are related in typicality, frequency, and by perpetrator.  The actions all center around the Spanish-speaking policy and its effects.  All of them also involve the same person -- Peggy Gillean.  Also, many of the actions are repetitive actions that occur more than once.  These actions are closely enough related in typicality, frequency, and by perpetrator to be analogous to a hostile work environment claim and are not barred by failure to

exhaust.

The Court believes that the following actions are discrete and as such are barred because of failure to exhaust: (i) being denied "Pat on the Back" awards; and (ii) being written up for working through lunch.  Not receiving "Pat on the Back" awards and being written up for working through lunch are not sufficiently related in typicality, frequency, and by perpetrator to be analogous to a hostile work environment claim and instead are discrete actions.  Although the write up is related to the same perpetrator, Gillean, it occurred before the No-Spanish policy was instituted, and is not related in subject matter to the actions listed above.  It also is not repetitive in nature, such as being spied on or followed on breaks.  The denial of a "Pat on the Back" award is not related in subject matter to those above, and did not occur frequently, and they were handed out by both Gillean and Coffey.  These actions appear to be more discrete and separate in frequency and typicality than those above.  Because these are discrete actions, and were not exhausted, they are barred.

The following claims based on disparate treatment and retaliation are dismissed without prejudice for failure to exhaust: (i) Larrazolo being sent home for the day without pay; (ii) Larrazolo driving 72 miles to a clinic when not needed; (iii) Larrazolo being denied "Pat on the Back" awards; (iv) Larrazolo being questioned for not getting a patient's weight correctly; (v) Larrazolo being denied placement with Dr. Steichen, as well as being forced to work with Wright; (vi) Larrazolo being yelled at for picking up the wrong lunch; (vii) Barber being denied "Pat on the Back" awards; and (viii) Barber being written up for working through lunch.

The Court will now turn to the merits of the following actions of which Larrazolo and Barber complain: (i) the Spanish-speaking policy; (ii) Larrazolo being "spied" on; (iii) Larrazolo being written up for not translating in Spanish; (iv) Larrazolo being followed outside on break; (v) Gillean

accusing Larrazolo of not being helpful and being rude to Larrazolo; (vi) Gillean questioning Larrazolo about the broken drawers; (vii) Larrazolo being more closely scrutinized; (viii) Barber being constructively discharged; (ix) Barber being watched or "scrutinized" more closely; (x) Barber's phone calls being recorded and monitored; and (xi) Barber being "spied on."

## II.   THE PLAINTIFFS ARE UNABLE TO SHOW THAT THERE IS A GENUINE ISSUE OF MATERIAL FACT AS TO THEIR DISCRIMINATION CLAIMS, AND LOVELACE IS ENTITLED TO JUDGMENT AS A MATTER OF LAW.

The Court is not convinced that 29 C.F.R. 1606.7(a) and the existence of a no-Spanish policy resolves all the issues in this case.  The existence of a no-Spanish policy may be enough to establish the element of an adverse employment action, show a prima facie case of disparate treatment, and create an inference of discrimination.  Such a policy, however, is not enough, alone, to establish a Title VII violation.  If a defendant presents a legitimate and non-discriminatory reason for the policy, the plaintiff still must present evidence of pretext.  In this case, Lovelace has pointed to legitimate, non-discriminatory reasons for its policy, and the Plaintiffs have not shown that these reasons are a pretext for discrimination.

### A.   ALTHOUGH PLAINTIFFS MAY BE ABLE TO ESTABLISH A PRIMA FACIE CASE OF DISPARATE TREATMENT IN RELATION TO THE SPANISH-SPEAKING POLICY, LOVELACE HAS ARTICULATED A LEGITIMATE AND NON-DISCRIMINATORY REASON FOR THE POLICY

Assuming without deciding that the Plaintiffs could establish a prima facie case of disparate treatment in relation to the Spanish-speaking policy, Lovelace has articulated a legitimate and non-discriminatory reason for the policy.  Danzer had forwarded to Gillean complaints made by co-workers that they were uncomfortable when Spanish-speaking employees spoke Spanish in front of them, and a Spanish-speaking patient had overheard employees conversing in Spanish in a derogatory

manner about another patient.  Rivet had also complained to Gillean about Spanish-speaking in the workplace.

> ### 1.    An English-Only Policy or a No-Spanish Policy Applied at All Times, Establishes, at Most, the Adverse Employment Action Element of the Disparate Treatment Prima Facie Case.

The  EEOC in 29 C.F.R. 1606.7(a) (2005) states: "A rule requiring employees to speak only English at all times in the workplace is a burdensome term and condition of employment . . . . [T]he Commission will presume that such a rule violates Title VII and will closely scrutinize it."  29 C.F.R. 1607.7(b) states: "An employer may have a rule requiring that employees speak only in English at certain times where the employer can show that the rule is justified by business necessity."

The Court, for purposes of summary judgment, will assume without deciding that the Tenth Circuit would give deference to 29 C.F.R. 1606.7, and find that an English-only policy[8] and a no-Spanish policy, applied at all times, do not conform with the EEOC guideline.  The question then becomes: What effect does such non-conformance have in the context of a disparate treatment claim?[9]

_____

[8] The United States Court of Appeals for the Ninth Circuit has reached an opposite conclusion to that stated in 29 C.F.R. 1607.7(a) and (b) and has held that the existence of an English-only policy applied to bilingual employees, alone, does not establish a prima facie case in a disparate impact cause of action.  See Garcia v. Spun Steak, 998 F.2d at 1489-90.  A majority of Courts have reached a similar result.  See, e.g., Sanchez v. City of Altus, 2004 U.S. Dist. LEXIS 3252, at *17-28 ("The Court agrees with the Ninth Circuit view that Section 1607.7 contravenes Congressional intent as expressed in Title VII, insofar as it establishes a presumption that English-only policies have disparate impact on minority employees in the absence of proof.")(citing Garcia v. Spun Steak, 998 F.2d at 1490)); Cosme v. Salvation Army, 284 F.Supp. 2d at 239-240 (holding that an English-only rule that prevents some employees from exercising a preference to converse in Spanish does not convert the policy into discrimination based on national origin).  A minority of courts have reached the opposite conclusion as Garcia v. Spun Steak, and have given deference to 29 C.F.R. 1606.7.  See EEOC v. Synchro-Start Product, Inc., 29 F.Supp. 2d 911, 915 (N. D. Ill. 1999); EEOC v. Premier Operator Services, Inc., 113 F.Supp. 2d 1066, 1073-76 (N. D. Tex. 2000).

[9] The Plaintiffs' arguments in their briefing specifically concerns disparate treatment claims.  The law to which the Plaintiffs cite is centered around the McDonnel Douglas framework in the

Assuming that the Tenth Circuit would give deference to the EEOC guideline, an English-only policy or a no-Spanish policy applied at all times, and thus not in conformance with 29 C.F.R. 1606.7(a), establishes at most one element of the prima facie case of disparate treatment -- adverse employment action.

One court has found that an English-only rule when applied at all times constituted disparate treatment and was a violation of Title VII.  See EEOC v. Premier Operator Servs., 113 F. Supp. 2d at 1073.  That court, however, found that there was no business justification for the policy, and intent was supported on the record by the manner in which the Hispanic employees were replaced by non-Hispanic employees, testimony of ethnic slurs and the enactment and implementation of the policy. See id. at 1070-72.  The Court also found that the existence of the policy itself when applied at all times showed significant adverse impact.  See id. at 1073.  The facts here are different.  Here the policy was never enforced, whereas in Premier Operator Servs., several employees were terminated for not agreeing to abide by the policy, and others were terminated immediately upon filing charges with the EEOC.  In addition, there is evidence before the Court that there was a legitimate business

_____

disparate treatment context.  See Response at 2.  Thus it does not appear that the Plaintiffs are arguing disparate impact.  The Plaintiffs specifically mention disparate treatment in both their Complaint and their Response to the Motion for Summary Judgment, but do not specifically mention disparate impact.  In addition, when the Plaintiffs bring up the alleged violation of 29 C.F.R. 1606.7, they do so within the McDonnel Douglas framework of their disparate treatment claim.  And even if the Plaintiffs were alleging disparate impact, Lovelace has presented a sufficient business justification for the policy -- co-workers felt uncomfortable and one patient had complained of overhearing Spanish speakers talking in Spanish in a derogatory manner about another patient, and the Plaintiffs have not raised a genuine issue of material fact as to this reason.  See Sanchez v. City of Altus, 2004 U.S. Dist. LEXIS 3252, at *33 (finding alternatively that sufficient business justification was shown by the fact that city officials had received complaints that some employees could not understand what was being said on the City's radio frequency because other employees were speaking Spanish and that city officials received complaints from non-Spanish-speaking employees who felt uncomfortable when their co-workers spoke Spanish in front of them).

explanation for the policy, and the Plaintiffs here were not subject to any ethnic slurs.

In a different case, the court in EEOC v. Premier Operator Servs., 75 F.Supp. 2d 550 (N. D. Tex. 1999), found that an English-only policy in combination with other evidence on the record established a prima facie case of disparate treatment. See 75 F.Supp. 2d at 558. The court then went on to look at whether there was a legitimate and non-discriminatory explanation for the policy. See id. at 559.

This Court does not believe that a violation of 29 C.F.R. 1606.7(a) automatically constitutes disparate treatment, but that such a violation establishes one element of the Plaintiffs' prima facie case of disparate treatment -- adverse employment action. The language of the guideline itself supports this conclusion. 29 C.F.R. 1606.7(a) states in relevant part that when an employer establishes an English-only policy that is applied at all times, the EEOC will "presume that such a rule violates Title VII and will closely scrutinize it." This is not language that would tend to support a blanket construction interpreting the guideline as mandating judgment in favor of plaintiffs whenever an English-only policy is applied at all times, but rather supports a construction that certain inferences are raised with the existence of an English-only policy that is applied at all times, and the policy should be scrutinized. 29 C.F.R. 1606.7(a) also mentions that such a policy could disadvantage an individual's employment opportunities, or may create an atmosphere of inferiority, isolation, and intimidation. This language appears to the Court to be analogous to an adverse employment action in the disparate treatment prima facie context.

This construction of the Guideline is also consistent with case law concerning English-only policies in the disparate impact context. For example, the court in Spun Steak stated: "The EEOC Guidelines provide that an employee meets the prima facie case in a disparate impact cause of action

merely by proving the existence of the English-only policy." Garcia v. Spun Steak, 998 F.2d at 1489 (citing 29 C.F.R. § 1606.7 (a) & (b) (1991)).  Thus, the Ninth Circuit assumed that a violation of either (a) or (b) in the disparate impact context established the plaintiff's prima facie case of disparate impact, and not that such a violation established disparate impact in its entirety leaving no room for a defendant to justify its decision and policy.  See also EEOC v. Synchro-Start Prods., 29 F. Supp. 2d at 914 ("[T]he effect of EEOC's presumption [] is only to move the inquiry to the second step prescribed by the statute -- the employer's need to identify a business justification."); EEOC v. Premier Operator Servs., 113 F. Supp. 2d 1066.  Thus, in a disparate impact case, an English-only policy establishes, if deference is given to 29 C.F.R. § 1606.7, a prima facie case of disparate impact, i.e., a significant disparate impact on a protected group.  See EEOC v. Horizon/CMS Healthcare Corp., 220 F.3d 1184, 1196 (10th Cir. 2000)("To establish a prima facie case in a disparate impact case, a plaintiff must prove that a 'specific identifiable employment practice or policy caused a significant disparate impact on a protected group.'")(quoting Ortega v. Safeway Stores, Inc., 943 F.2d 1230, 1242 (10th Cir. 1991)).  It would be inconsistent to find that an English-only policy or no-Spanish policy may establish a prima facie case of disparate impact, at which point the defendant could present a business justification, but that in a disparate treatment context, such a policy would, alone, establish a violation of Title VII, without regard to the defendant's legitimate and non-discriminatory reasons behind the policy.

Finally, Title VII requires that plaintiffs prove intentional discrimination in a disparate treatment context, see Ortega v. Safeway Stores, Inc., 943 F.2d at 1242 ("A claim of disparate impact, unlike a claim of disparate treatment, does not require a finding of intentional discrimination."), and the Court believes that an English-only policy or a no-Spanish policy, without

more, is not sufficient to prove such intentional discrimination, but rather may be sufficient to establish the adverse employment action element of the disparate treatment prima facie case. The Court believes that, assuming the Tenth Circuit would give deference to the EEOC guideline, an English-only policy or no-Spanish policy, when applied at all times, establishes, at most, one element of a prima facie case of disparate treatment.

The Plaintiffs contend that they are unaware of any case that has found that an English-only policy applied at all times does not violate Title VII.  See Response at 18.  The Court is aware of at least one case that has found that an English-only policy applied at all times did not violate Title VII. See Long v. First Union Corp., 894 F.Supp. 933 (E.D. Va. 1995).  In Long, the plaintiffs were told not to speak Spanish at the bank except to assist a Spanish-speaking customer of the bank, similar to the policy here where the Plaintiffs were told not to speak Spanish except to translate.  See id. at 942.  The plaintiffs in Long argued that an English-only policy applied at all times was a violation of Title VII.  See id. at 940.  The court declined to give deference to the EEOC guidelines, and found that such a policy was not a per se disparate impact violation of Title VII, and that the policy did not violate Title VII as the defendant had offered a sufficient business justification.  See id. at 940-41.

**2.    Lovelace has Articulated a Legitimate and Non-Discriminatory Reason for the Policy and the Plaintiffs Have not Shown Pretext.**

Assuming without deciding that the Plaintiffs can establish a prima facie case of disparate treatment, Lovelace has articulated a legitimate and non-discriminatory reason for the policy -- other employees complained that they felt uncomfortable when employees spoke to each other in Spanish, and one patient complained to management concerning an overheard conversation where derogatory remarks were made between Spanish-speaking co-workers in Spanish about a patient.  See Danzer

Decl. ¶ 4, at 2; Barber Depo. at 92:2-19.   Both of these reasons are legitimate and non-discriminatory.   See Sanchez v. City of Altus, 2004 U.S. Dist. LEXIS 3252, at *33 (finding alternatively that sufficient business justification was shown by the fact that city officials had received complaints that some employees could not understand what was being said on the City's radio frequency because other employees were speaking Spanish and that city officials received complaints from non-Spanish-speaking employees who felt uncomfortable when their co-workers spoke Spanish in front of them).   See also Prado v. L. Luria & Sons, Inc., 975 F.Supp. 1349, 1357 (S.D. Fla. 1997)("An insistence that employees speak English in the workplace serves the added business purpose of minimizing the sense of alienation and resulting hostility felt by employees and customers who don't speak or understand the foreign language."); Long v. First Union Corp., 894 F.Supp. at 942 (finding that complaints by co-workers that plaintiffs were making fun of them in Spanish and that the constant Spanish-speaking made the co-workers uncomfortable was a legitimate non-discriminatory explanation in the disparate treatment context).   Plaintiffs argue that Defendant can point to no legitimate business interest for not allowing Spanish to be spoken at lunch or on break. See Response at 18.   Although there is a dispute whether the policy allowed employees to speak Spanish at lunch, or on break, the fact remains that the Plaintiffs continued to speak Spanish on break and at lunch.   The policy was never enforced, but specifically, it was not enforced as to breaks and lunch.   The Plaintiffs spoke Spanish on breaks and at lunch under the impression that they were being watched and reported to Gillean.

Additionally, Lovelace's burden in a disparate impact case is not to show a legitimate business justification, but rather to articulate a legitimate and non-discriminatory reason for the policy.   The defendant is not, at this stage of the proceedings, obligated to litigate the merits of its reasoning nor

prove that the "reason relied upon was bona fide." <u>EEOC v. Flasher Co.</u>, 986 F.2d at 1316.  If this were a disparate impact case the burden would be business justification, but this is a disparate treatment case.

Therefore, assuming without deciding that the Tenth Circuit would give deference to the EEOC guideline, and finding that non-conformance with such guideline would establish the adverse employment action element of a prima facie disparate treatment claim, Lovelace has articulated a legitimate and non-discriminatory reason for the policy, and the Plaintiffs have not presented evidence of pretext.

The Plaintiffs point to Lopez' testimony that she never heard employees make derogatory comments about co-workers in Spanish.  <u>See</u> Response at 18.  That Lopez never heard employees make derogatory comments does not show that management was insincere in its belief that complaints had been made.  Danzer stated that co-workers and at least one patient had made complaints.  Danzer forwarded these complaints to Gillean.  Rivet also complained to Gillean.  The Plaintiffs have not pointed to any evidence that shows that these complaints were not made, or that management did not take them seriously in that they were the impetus behind the policy.  In fact, the Plaintiffs' own testimony supports the fact that at least co-workers made complaints.  <u>See</u> Barber Depo. at 92:2-19.

The Plaintiffs also contend that the fact that the policy is a no-Spanish policy is evidence of pretext by itself.  The Court is not persuaded.  Co-workers told management that they were uncomfortable around employees that spoke Spanish to each other in front of them, and a patient told Danzer, who relayed the information to Gillean, that Spanish-speaking employees had spoken in a derogatory manner in Spanish about another patient.  Management then told all Spanish speakers that they could not speak Spanish at work.  The problem that had been brought to management's attention

specifically dealt with Spanish-speaking in the workplace.  Although management may have made a bad decision in instituting the no-Spanish policy, that does not show pretext.  The policy here alone does not show pretext.  It was related to the problems that had been brought to management's attention.  The Plaintiffs have not shown that the explanations offered by Lovelace were pretextual for a different discriminatory reason.

Finally, that there was a German speaker and a Native American, both of whom spoke on the telephone in a language other than English, does not show pretext.  First, there is no evidence on the record that there was any need for management to tell the German speaking employee and the Native American employee to only speak English.  There was only one German speaking employee, and the evidence suggests that the employee spoke German on the telephone and not with other employees; the same is true for the Native American employee.[10]  See Larrazolo Depo. at 130:9-131:15.  Management received complaints, however, concerning the speaking of Spanish in the workplace in that some employees were not comfortable when the Spanish-speaking employees spoke Spanish with each other, and management believed a patient had overheard Spanish-speaking employees speaking in Spanish in a derogatory manner about another patient.  To combat these complaints, management asked the Spanish-speaking employees not to speak Spanish at work.  The German speaker and the Native American were in groups of one as to their foreign language speaking abilities and had no reason to speak to other employees in a language other than English.  Additionally, although the Plaintiffs have pointed to evidence that shows that, at some point in their employment history, the

---

[10] There is evidence in the record that sometime in 2002, before Gillean arrived at the clinic, there was another Native American employee, and the two Native American employees would speak to each other in a language other than English.  See Larrazolo Depo. at 130:9-25; Barber Depo. at 30:3-20.

German speaker and the Native American spoke in a language other than English on the telephone, there is no evidence to suggest that this happened after Lovelace introduced the no-Spanish policy. If there were evidence before the Court that Lovelace had any reason to tell the German speaker or the Native American speaker to speak only English, and management had still not included those foreign languages in the policy, then that evidence might show pretext; however, here, management had reason only to address the speaking of Spanish in the workplace.

There is no evidence before the Court that animus toward Hispanic employees motivated the no-Spanish policy. No one at the clinic ever made any racial slurs. See Barber Depo. at 99:14-16.

### 3. A No-Spanish Policy Does Not Lead the Court to a Different Conclusion.

The Plaintiffs distinguish this no-Spanish policy from an English-only policy in arguing that the Court should not follow Spun Steak and should give deference to 29 C.F.R. 1606.7. The Tenth Circuit has not decided the issue whether deference should be given to 29 C.F.R. 1606.7 in the English-only context or no-Spanish context. Again, the Court will assume without deciding, for purposes of summary judgment, that both policies if applied at all times would not be in conformance with 29 C.F.R. 1606.7 (a) and will give deference to the EEOC guideline. The Court finds that if it gave deference to the EEOC guideline, and a prima facie case of discrimination were established, Lovelace has articulated a legitimate non-discriminatory reason for the policy and the Plaintiffs have not shown pretext; therefore, the Court reaches the same conclusion regardless of whether the Court characterizes the policy as an English-only policy or as a no-Spanish policy. In either situation, the Court will assume without deciding, for purposes of summary judgment, that the adverse employment action element of the prima facie case is established, and thus the characterization of the policy leads the Court to the same conclusion.

In support of their contention, the Plaintiffs cite the Court to <u>Olivarez v. Centura Health Corp.</u>, 203 F.Supp.2d at 1218, which stated in a footnote: "If there was a policy that prohibited Spanish-speaking only, rather than requiring that English be spoken, even if such a prohibition was applied only [sometimes], the policy would not be in compliance with 29 C.F.R. § 1606.7(b)." 203 F.Supp.2d at 1224 n.2.   The plaintiffs in <u>Olivarez</u> alleged that the defendants had a policy of "prohibiting Spanish-speaking employees from speaking Spanish in the presence of residents, while not prohibiting Serbian employees from speaking Serbian in front of residents."   <u>Id.</u> at 1223. Assuming without deciding that the court in <u>Olivarez</u> is correct that a no-Spanish policy, alone, is a violation of 29 C.F.R. § 1606.7, again this brings the Court to the same conclusion.   A violation of 29 C.F.R. § 1606.7 -- at most -- establishes the adverse employment action element of the prima facie case.

In addition, the Court is not convinced that such a distinction has merit.   A rule concluding that no-Spanish policies as applied to bilingual Hispanic employees are not in conformance with 29 C.F.R. § 1606.7, while English-only policies as applied to bilingual Hispanic employees are permissible, could lead to inconsistent results.   For example, one company could institute an English-only policy by instructing its bilingual Spanish-speaking employees that they could speak only English and this policy would be permissible, while a second company made up of identical characteristics instituted a no-Spanish policy by instructing its bilingual Spanish-speaking employees that they could not speak Spanish at the workplace.   Management for both companies could have identical neutral motivations underlying the policy and identical national origin makeup among its employees, but because one company told Spanish-speaking employees that they could not speak Spanish it would be in violation of 29 C.F.R. § 1606.7, whereas the other company's policy would be permissible

because it told its Spanish-speaking employees that they had to speak English.  Such results would promote form over substance.

Finally, the Court notes that Lovelace never enforced its no-Spanish policy.  Spanish speakers, including the Plaintiffs, violated the policy and continued to speak Spanish on the job, and Lovelace did not discipline them.  Lovelace did not discipline any employees, including Hispanic employees, under this policy.  The Plaintiffs admit that they continued to speak Spanish at work in violation of their interpretation of the rule.  They knowingly violated what they believed the rule to be, and did so with knowledge that other employees were aware of this violation, and in the belief that these employees were telling management about this violation.  And, although they were sometimes questioned about speaking Spanish on the phone, Lovelace never disciplined them.

Defendant has shown that there is no genuine issue of material fact as to the Spanish policy, and is entitled to a judgment as a matter of law for the claimed disparate treatment from the policy.

### B.   THERE IS NO GENUINE ISSUE OF MATERIAL FACT AS TO ANY OF LARRAZOLO'S CLAIMS OF DISCRIMINATION, AND LOVELACE IS ENTITLED TO JUDGMENT AS A MATTER OF LAW.

Larrazolo complains about a number of actions that various Lovelace employees took.  A careful review of the alleged actions shows, however, that none of the actions constitute an actionable adverse employment action.  Larrazolo points to the following as evidence of adverse employment action: (i) Larrazolo was "spied" on; (ii) Larrazolo was written up for not translating in Spanish; (iii) Larrazolo was followed outside on break; (iv) Gillean accused Larrazolo of not being helpful and Gillean was rude to Larrazolo; (v) Gillean questioned Larrazolo about the broken drawers; and (vi) Larrazolo was more closely scrutinized.  Response at 15.

"Conduct rises to the level of 'adverse employment action' when it 'constitutes a significant

change in employment status, such as hiring, firing, failing to promote, reassignment with significantly different responsibilities, or a decision causing a significant change in benefits.'" Stinnett v. Safeway, Inc., 337 F.3d 1213, 1217 (10th Cir. 2003)(quoting Sanchez v. Denver Pub. Sch., 164 F.3d at 532). "[T]he phrase 'adverse employment action' is to be liberally defined. 'Such actions are not simply limited to monetary losses in the form of wages or benefits. Instead, [the Tenth Circuit] take[s] a case-by-case approach, examining the unique factors relevant to the situation at hand.'" Id. (quoting Sanchez v. Denver Pub. Sch., 164 F.3d at 532). "Actions presenting nothing beyond a 'mere inconvenience or alteration of responsibilities,' however, do not constitute adverse employment action.'" Id. (quoting Sanchez v. Denver Pub. Sch., 164 F.3d at 532).

Larrazolo's write up for refusing to translate in Spanish does not rise to the level of adverse employment action. The write up was rescinded, and thus did not affect her employment status. It did not affect her compensation or benefits in any practical way. See Lee v. New Mexico Bd. of Regents, 102 F. Supp. 2d 1265, 1275 (D.N.M. 2000)("Examples of employer actions which do not constitute adverse employment actions include verbal admonishment, written warnings or negative evaluations which are later rescinded . . . .")(citing Fortner v. State of Kansas, 934 F. Supp. 1252 (D. Kan. 1996)).

That Gillean was rude to Larrazolo, and accused her of not being helpful; that Gillean questioned Larrazolo regarding broken drawers; and that Larrazolo was followed on break, do not rise to the level of adverse employment action. None of these actions had a practical effect on Larrazolo's employment status. There is no evidence on the record that any of the above actions led to Larrazolo being disciplined. This increased tension, and these unpleasant personal relationships, do not rise to adverse employment action. See Heno v. Sprint/United Mgmt. Co., 208 F.3d 847, 857-

58 (10th Cir. 2000)(finding no adverse action where plaintiff's desk was moved to a different location; her telephone calls were monitored; plaintiff's immediate supervisor and other employees acted in a 'chilly' manner towards her, which made her feel isolated; the Human Resources Department refused to further investigate her complaint once they found out she had filed an EEOC complaint; and it was suggested that she might wish to transfer to a different department because the inside sales department was shifting to a commission format on which the plaintiff had previously struggled).

The Plaintiffs contend that they were "spied on" and scrutinized more closely.  Response ¶¶ 1-2, at 6, 16.  This does not rise to adverse employment action.

Larrazolo testified that she heard Tracy tell Barber and Snow that Gillean had asked her to "spy" on Barber, Larrazolo, and Snow to see if they were spending time together, because "they didn't want the three of [them] together."  Larrazolo Depo. at 46:20-47:21.  Barber testified that Dr. Wong told her that Bauman told him told she was "asked to watch to see if we spoke Spanish." Barber Depo. at 58:15-59-5.  Lopez states: "After the meeting, I was asked to monitor the staff to see who was speaking Spanish.  It was obvious that this was aimed at the employees who were Hispanic." Lopez Aff. ¶ 4, at 1.  This statement does indicate who asked Lopez to monitor the staff, nor does Lopez state why it was obvious that this request was aimed at the employees who were Hispanic.  Larrazolo testified that Barber told her that Lopez told Barber they were being watched and to be careful.  See Larrazolo Depo. at 50:5-8.

The Plaintiffs also contend that their work was more closely scrutinized.  See Barber Depo. at 80:9-82:14.  This contention is based partly on the above statements concerning spying, and statements that Barber testified were made by unidentified workers, as well as Barber's conclusory

belief from her own experience that Gillean began to come to the clinic more frequently.  This contention is also based on Lopez' statement in her affidavit that "[she] believed that Ms. Gillean singled out the Plaintiffs.  When she was in the clinic, she scrutinized Plaintiffs' clock in times and general work duties, including Plaintiffs' phone use."  Lopez Aff. ¶ 6, at 2.  Lopez does not state on what her knowledge is based -- whether it is firsthand personal knowledge or whether it is based on information other people told her.  She only states that she "believed" Gillean singled out the Plaintiffs.  The court must disregard statements of mere belief.  See Tavery v. U.S., 32 F.3d at 1427 n.4.[11]

That the Plaintiffs' work was more closely scrutinized, and that co-workers watched the Plaintiffs, do not rise to the level of adverse employment actions.  None of these actions practically affect the Plaintiffs' employment status.  See Heno v. Sprint/United Mgmt. Co., 208 F.3d at 857-58.  There is no evidence that watching and scrutinizing the Plaintiffs and their work more closely affected compensation, benefits, discipline, or future employment opportunities in any practical way.

Larrazolo's complained of actions, looked at separately or in the aggregate, do not rise to adverse employment action.  Because the complained of actions are not adverse employment actions, Larrazolo has not established a prima facie case of disparate treatment.

---

[11] Lovelace contends that the statements by Tracy, Dr. Wong, Lopez, and Larrazolo -- concerning what Barber told her Lopez said -- are inadmissible hearsay.  See Motion for Summary Judgment at 20.  The Court is not convinced that all of the statements are inadmissable hearsay.  The statement  by Tracy is not inadmissible hearsay as Tracy was a servant of Lovelace and thus her statement could be considered an admission by a party opponent.  See Fed. R. Evid. 801(2).  But, regardless whether the statements are hearsay, the actions do not rise to actionable adverse employment action.

**C.    THERE IS NO GENUINE ISSUE OF MATERIAL FACT AS TO ANY OF BARBER'S CLAIMS OF DISCRIMINATION, AND LOVELACE IS ENTITLED TO JUDGMENT AS A MATTER OF LAW.**

Barber cannot establish that the remaining actions of which she complains are adverse employment actions.  Although constructive discharge is considered an adverse employment action, see Baca v. Sklar, 398 F.3d at 1216, Barber cannot show that she suffered constructive discharge. Accordingly, the Court will enter judgment for Lovelace on Barber's discrimination claims.

**1.    None of the Actions of Which Barber Complains Rise to the Level of Adverse Employment Action in the Title VII Context.**

Barber points to the following remaining actions as evidence of adverse employment action: (i) Barber was constructively discharged; (ii) co-workers "spied on" Barber; (iii) Barber's work was closely scrutinized; (iv) Barber's calls were tracked, and when she translated for Spanish-speaking patients, she was questioned about the nature of her conversation.  Response at 14.

First, Barber's allegations that she was "spied on"; her work was more closely scrutinized; and she did not receive a "Pat on the Back" award fail for the same reasons as discussed previously under Larrazolo's claims.

Barber next contends that her phone calls were monitored.  There is not more than a scintilla of evidence that this occurred.  Barber bases her allegation on the fact that Bauman told Dr. Wong who told Barber -- inadmissible hearsay -- that they were being recorded, and she would hear things she said in her personal conversations talked about by other employees.  Barber admits that she does not know that her calls were being recorded.  See Barber Depo. at 82:18-19.  She also admits that the work area was a tight space.  See id. at 83:22-25.  Barber called the communications head, Craig Mobley, and asked him if her calls were being recorded, and she was told that calls coming into the

clinic for appointments and triage would probably be the only ones to be tracked and recorded for quality assurance purposes.  He also told her that he did not believe that voice mail could be recorded. See id. at 83:2-10.  Even if there were enough admissible evidence to show that Barber's phone calls were being recorded and combined with the fact that Barber was questioned about the nature of her conversations with patients, such recording and questioning would not be an adverse employment action.  See Heno v. Sprint/United Mgmt. Co., 208 F.3d at 857-58.

Finally, Barber alleges that she was constructively discharged.  If Barber could show that she was constructively discharged, then such discharge would be an adverse employment action.  As discussed in the following section, Barber was not constructively discharged.

The actions of which Barber complains, looked at either separately or in the aggregate, do not rise to the level of adverse employment action.  Her employment status was not practically or immediately impacted, nor was her compensation or benefits affected.  Thus, Barber cannot establish a prima facie case of  disparate treatment.

### 2.        Barber Cannot Show That She Suffered Constructive Discharge.

Although constructive discharge is an adverse employment action, Barber has not shown that she suffered such discharge.  "'Constructive discharge occurs when the employer by its illegal discriminatory acts has made working conditions so difficult that a reasonable person in the employee's position would feel compelled to resign.  Essentially, a plaintiff must show that she had *no other choice* but to quit. '"  Sandoval v. Boulder Reg'l Communs. Ctr., 388 F.3d at 1325 (emphasis in original).  The bar is quite high in [constructive discharge] cases."  Garrett v. Hewlett-Packard Co., 305 F.3d at 1221.  Barber has not shown that there is a genuine issue of material fact as to her constructive discharge.  The evidence shows that Barber was not constructively

discharged.  Barber contends that she resigned because she felt she was being watched, there was a

lot of gossip about Spanish-speaking at the clinic, and she was asked by co-workers if she would ever

speak Spanish again.  See Barber Depo. at 112:5-114:21.  These facts do not create a constructive

discharge.  They do not show that a reasonable person in Barber's position would feel compelled to

resign, nor that Barber had no other choice but to quit.  Additionally, Barber testified that the increase

in her pay at New Mexico Spine played a role in her decision to resign her employment.  See id. at

114:22-115:5.  She also testified that if she had not had another job lined up, she would have

remained employed at the Tramway Clinic.  See id. at 117:10-16.  Because Barber would not have

left her job unless she had something else lined up, and the increase in pay influenced her decision,

she cannot show that she had no other choice but to quit.  The evidence she has offered does not

meet the "high bar" that is required in a constructive discharge case.[12]

## III.   THE PLAINTIFFS HAVE NOT SHOWN THAT THERE IS A GENUINE ISSUE OF MATERIAL FACT AS TO THEIR REMAINING RETALIATION CLAIMS, AND LOVELACE IS ENTITLED TO JUDGMENT AS A MATTER OF LAW.

The Plaintiffs' retaliation claims fail because there is no adverse employment action, and thus,

the Plaintiffs cannot establish a prima facie case of retaliation.  To establish a prima facie case of

retaliation, the plaintiff must show that: (i) the plaintiff engaged in protected opposition or

_____

[12] In the alternative, Lovelace argues that Barber's claim of constructive discharge fails because it is a discrete action and she did not exhaust her administrative remedies.  The Court, however, does not believe that the constructive discharge was discrete and separate from the actions alleged in her EEOC charge.  In her EEOC charge, Barber complained of the Spanish-speaking policy; being watched more closely; and having her calls recorded.  The policy and the atmosphere after the policy was instituted, including being watched more closely, are the basis for Barber's constructive discharge - - she felt she was being watched, there was gossip about Spanish-speaking at the clinic, and she was asked by co-workers if she would ever speak Spanish again.  These are not discrete continuing violations of her underlying EEOC charge, but rather are part and parcel of the facts found in the charge itself and more analogous to a hostile work environment claim.

participated in a Title VII proceeding; (ii) the employer took an adverse employment action against

the plaintiff subsequent to the protected activity; and (iii) there is a causal connection between the

plaintiff's participation in the protected activity and the adverse employment action taken by the

employer.  See Mattioda v. White, 323 F.3d at 1293.

As discussed under their discrimination claims, none of the remaining actions of which Barber

and Larrazolo complain are adverse employment actions, and Barber cannot show that she was

constructively discharged.  There is therefore no genuine issue of material fact on the retaliation

claims and Defendant is entitled to judgment as a matter of law.[13]

## IV.    BARBER HAS NOT SHOWN THAT THERE IS A GENUINE ISSUE OF MATERIAL FACT AS TO HER STATE CONSTRUCTIVE DISCHARGE CLAIM, AND LOVELACE IS ENTITLED TO JUDGMENT AS A MATTER OF LAW.

The Supreme Court of New Mexico relied on and used Tenth Circuit law in Gormley v.

Coca-Cola Enters., 137 N.M. 192, 109 P.3d 280, in analyzing a claim for constructive discharge.  The

Court specifically quoted Tenth Circuit law:

> An employee must allege facts sufficient to find that the employer made working conditions so intolerable, when viewed objectively, that a reasonable person would be compelled to resign. See Derr v. Gulf Oil Corp., 796 F.2d 340, 344 (10th Cir. 1986). "Essentially, a plaintiff must show that she had no other choice but to quit." Yearous v. Niobrara County Mem'l Hosp., 128 F.3d 1351, 1356 (10th Cir. 1997) (quoted authority omitted). "The bar is quite high" for proving constructive discharge. Garrett v. Hewlett-Packard Co., 305 F.3d 1210, 1221 (10th Cir. 2002).

Gormley v. Coca-Cola Enters., 137 N.M. at ___, 109 P.3d at 282-83.  Barber's resignation was not

constructive discharge, and the evidence shows that Barber was not constructively discharged.

Barber contends that she resigned because she felt she was being watched, there was a lot of gossip

---

[13] Additionally, actions that occurred before the Plaintiffs engaged in protected activity, such as the institution of the no-Spanish policy itself, are not retaliatory.

about Spanish-speaking at the clinic, and she was asked by co-workers if she would ever speak Spanish again.  See Barber Depo. at 112:5-114:21.  These facts are not sufficient to show constructive discharge under New Mexico law.  They do not show that a reasonable person in Barber's position would feel compelled to resign, nor that Barber had no other choice but to quit.  Additionally, Barber testified that the increase in her pay at New Mexico Spine played a role in her decision to resign her employment.  See id. at 114:22-115:5.  She also testified that if she had not had another job lined up, she would have remained employed at the Tramway Clinic.  See id. at 117:10-16.  Because Barber would not have resigned her position unless she had something else lined up, and the increase in pay influenced her decision, she cannot show that she had no other choice but to quit.  The evidence she has offered does not meet the "high bar" required in a constructive discharge case.

**IT IS ORDERED** that the Defendant Lovelace Sandia Health Systems' Motion for Summary Judgment is granted.  The Court grants summary judgment for Lovelace Sandia Health Systems and against Barber on all of Barber's claims.  The Court grants summary judgment for Lovelace Sandia Health Systems and against Larrazolo on all of Larrazolo's claims.  The Court will dismiss any claims based on the following actions without prejudice for failure to exhaust administrative remedies: (i) Larrazolo being sent home for the day without pay; (ii) Larrazolo driving 72 miles to a clinic when not needed; (iii) Larrazolo being denied "Pat on the Back" awards; (iv) Larrazolo being questioned for not getting a patient's weight; (v) Larrazolo being denied placement with Dr. Steichen, as well as being forced to work with Wright; (vi) Larrazolo being yelled at for picking up the wrong lunch; (vii) Barber being denied "Pat on the Back" awards; and (viii) Barber being written up for working through lunch.  All other claims by Barber and Larrazolo against Lovelace Sandia Health Systems are dismissed with prejudice.

_____
UNITED STATES DISTRICT JUDGE

*Counsel:*

Gilbert J. Vigil
Jason Michael Burnette
Albuquerque, New Mexico

     *Attorney for the Plaintiffs*

Patrick F. Clark
Amy Traub
Epstein Becker & Green PC
Atlanta, Georgia

-- and –

Lorna M. Wiggins
Wiggins, Williams & Wiggins
Albuquerque, New Mexico

     *Attorneys for the Defendant*